The bill in this cause is filed under an act of the legislature of the State of New Jersey entitled "An act to secure the payment to laborers, mechanics, merchants, traders and persons employed upon or furnishing materials towards the performance of any work in cities, towns, townships and other municipalities of this state (Revision of 1918), and supplements thereto and amendments thereof."
The pleadings consist of a bill and answer, as well as counter-claim filed by the city of Jersey City against McGovern, its contractor, for damages, and by McGovern against the complainant for damages. A counter-claim is not a proper pleading in this suit, although the subject-matter is proper in the answer. Norton v. Sinkhorn, 63 N.J. Eq. 313, 320. In the answer of Jersey City the same matter is set out as in the counter-claim. To some extent the answer of the defendant McGovern sets out substantially the same matter set out in the counter-claim. If the defendants deem it necessary they may amend their answers, in view of the fact that the counter-claims will be stricken out. These answers, in addition to answering the bill, set up claims for unliquidated damages, as will appear from the statement of facts following.
Prior to the Chancery act of 1915 (P.L. p. 184) the court could not entertain these claims for unliquidated damages (Norton v. Sinkhorn, supra), the court there saying that "the fund should be retained in the court of chancery and the cause allowed to stand over until the defendants shall have their damages arising from the breach of contract by the complainant set out in the answer assessed in a court of law, within such time and in such manner as the court of chancery may direct." By the act of 1915, page 186, section 8, it is provided as follows:
"Jury trial. If any question ordinarily determinable at law and requiring a jury trial arise in a suit of which the court of chancery has jurisdiction, a jury trial, if required, may be ordered, but shall be deemed to be waived unless demanded in the pleadings. In case of such demand, if the issue be one requiring a jury trial, the court will send such issue of fact to a court of law for trial, according to the existing practice." *Page 523 
Under the Lien act of 1918, page 1041, section 9, provision is substantially made for staying the suit until the determination of a suit at law, where it is made to appear by the contractor, subcontractor, municipality or other defendant that such party has a valid defense at law which cannot be set up in defense in a court of equity.
Under both of the foregoing acts it appears that the party desiring the suit stayed must take the affirmative in asking for a reference to a court of law for trial.
In Renwick v. Hay, 90 N.J. Eq. 148, 157, Vice-Chancellor Lane construed section 8, as well as sections 7 and 9, of the Chancery act of 1915; and in Shaw v. Beaumont Co., 88 N.J. Eq. 333,
Mr. Justice Black, after saying that the court of chancery cannot retain jurisdiction for the purpose of granting a purely legal remedy, or to try a claim for unliquidated damages, said: "The bill of complaint in this suit was filed April 22d 1915. The present Chancery act (P.L. 1915 p. 184 pl. 8) by which a jury trial shall be deemed to be waived, unless demanded in the pleadings, does not apply to this case." Ibid. pl. 12. The act of 1915 went into effect July 4th, 1915. In the present case no demand was made in the pleadings for a jury trial under the Chancery act of 1915; nor was it made to appear to the court, as required by section 9 of the Lien act, that any party had a valid defense at law which could not be set up in equity; and, in fact, all the parties desired that all of the issues in this cause be determined in this court.
The facts are as follows: The city of Jersey City, having a single seventy-two-inch pipe line for supplying Jersey City with water, and desiring to duplicate the same, on the 19th of August, 1919, entered into a contract with the defendant Patrick McGovern to construct the same for a sum in excess of $2,000,000. It was contemplated by the parties to connect the new and old water mains with "cross-overs" so that the water could be flowed from one pipe to the other. The cross-over so contemplated was to be what is termed a "dry connection," which could only be made when there was no water in either pipe. The method of construction was to bore a *Page 524 
sixteen-inch hole in each pipe and place over the opening thus made what is called a "hat," which, at the point of contact with the pipe, conformed to its shape, and is riveted thereto, forming a tight joint. To these "hats" are attached valves. Connecting these valves is a "cross-over," the ends of which being inserted in the valves, the joints are leaded for two purposes — one, to make them tight, and the other, to form a flexible joint so that if either pipe should sag the lead joint would yield. During the course of construction, by reason of the shortage of water in Jersey City, the city determined that it would put in, on the old pipe (which was then filled with water), what is called a "wet connection," in order that the supply of water during the operation would not be cut off. This wet connection is made in the following manner: A sleeve is placed around the pipe, the ends of which are riveted to the valve. In order to cut the opening in the pipe a tapping machine is inserted into the valve and brought in contact with the side of the pipe. There is a pilot drill in the centre which first bores through the pipe, and the cutter is then brought in contact with the pipe and revolves until it has cut the opening in the pipe. It is then withdrawn, carrying with it the circular piece of pipe, the valve closes, and there is then inserted in the valve the cross-over connecting with the valve on the other pipe.
In order to make this change the city, on the advice of Clyde Potts, the engineer in charge, on February 3d 1921, passed the following resolution:
"WHEREAS, It appears from a communication addressed to the board by the director of the department of streets and public improvements, dated February 1st, 1921, that certain changes in the contract between the city and Patrick McGovern are necessary and advisable, which changes are as follows:
"Extra Work Order `L.'
"The furnishing and delivering on the ground of five complete 72" x 16" split tees and tapping valves; the use of the tapping machine, five valves, and the tapping sleeves, together with the services of a superintendent operating the machine; the furnishing of all lead and labor necessary for the caulking of sleeves in place, and also labor to assist the superintendent in making the cuts, and the doing of all work incident to the making of such connections in good, workman *Page 525 
like manner. The cost of the above not to exceed the sum of nine thousand dollars ($9,000.00).
"All work shall be done in strict accordance with the directions of the engineer in charge, and subject to his apprpoval, and payment for the same will be made in accordance with section M of said contract.
"Now, therefore, be it resolved, That the contract be and the same is hereby changed and amended accordingly, and the contractor be and he is hereby authorized to proceed to make such changes;
"Further resolved, That a certified copy of this resolution be signed by the contractor and filed with the city clerk as evidence of its assent thereto."
This resolution and its acceptance form the contract between the city and the defendant McGovern as extra work under the main contract.
The defendant McGovern apparently was not equipped to install wet connections, and, after several communications and conferences, entered into a contract with the complainant, which is contained in a letter from McGovern to the complainant, dated March 16th, 1921, a copy of which is as follows:
"March 16th, 1921.
Water Works Equipment Co., 50 Church street, New York City.
Gentlemen:
 Attention Mr. Van Winkle.
Confirming telephone conversation of even date, kindly enter my order as follows:
Five (5) seventy-two (72") inch by sixteen (16") inch connections, consisting of tapping sleeves and valves for use on steel riveted pipe; use of tapping machine to make the five (5) sixteen (16") connections to seventy-two (72") inch steel main and the services of a man to superintend the operation of the tapping machine when connections are being made.
All for the sum of $1,400.00 per connection, F.O.B. cars, Jersey City
Total seven thousand ($7,000.00) dollars.
The materials furnished to be acceptable to the legally constituted authorities of the city of Jersey City or their representatives.
Payment will be made you in full on acceptance and payment being made to me by the city of Jersey City or partial payment made to you on receipt of any partial payment made to me by the city of Jersey City. *Page 526 
I understand you will commence work immediately on this order.
Please sign and return the enclosed copy of this letter for my files.
Yours truly,
PATRICK McGOVERN.
Accepted:
Water Works Equipment Company, By Walter H. Van Winkle. H.W. CC: M.O. cc: C.P."
The complainant had the first of these sleeves made, which sleeve was tested and approved by Mr. Potts before the remaining four were either manufactured or shipped. This first sleeve (being the most westerly one) is the sleeve that broke. It was installed June 15th, 1921, and the last one of the other four was installed July 25th, 1921.
The work to be done by the complainant under his contract with McGovern was substantially to install these sleeves and cut the openings. The work to be done by McGovern consisted in attaching the valves to the sleeves, inserting the cross-overs, with leaded joints, in these valves, and connecting them with the "hats" riveted to the empty pipe. When the connection was completed the water flowed from the old pipe into the new through these cross-overs, and was so flowing for a week, when, on September 5th, 1921 (forty-two days after the work on the last wet valve was completed and eighty-two days after work on the first sleeve was completed), the first sleeve installed broke at a point slightly above the top of the valve, allowing the water to escape in large quantities, which flow continued until the following Saturday, when the water then being removed from old pipe, McGovern replaced the sleeve with the "hat" connection. Thus, both pipes had one dry connection, as originally contemplated. This work cost McGovern upwards of $1,800, and the city of Jersey City rendered to McGovern a bill for upwards of $4,200 for water purchased and labor expense.
McGovern concedes that, if the city prevails, it has the right to deduct its ascertained damages from the amount due from the city to him, but both the complainant and McGovern contend that neither is liable to the city, and that *Page 527 
the city must suffer the loss and pay the balance due the contractor, including the sum paid for repairing the break. But, as between themselves, McGovern insists that if he is held liable the loss must fall on the complainant because of the break.
As between McGovern and the complainant, the complainant was to furnish the five connections, the tapping sleeves, c., and the services of a man to superintend the operation of the tapping machine when the connections were made. The materials so furnished were to be acceptable to the city or its representatives. Mr. Potts was the representative of the city, and accepted the complainant's work after inspection. The contract between McGovern and the complainant was not tied up to the contract between McGovern and Jersey City — it was independent of the latter contract.
There is no clear and positive evidence as to the cause of the break; it is left wholly to conjecture. The testimony of the experts is to the effect that the greatest strain on this sleeve is while the tapping machine is in the valve cutting the opening; that this strain was greater during this tapping process than after the connections were made to the other pipe with the water flowing through the same. The valve weighs upwards of four hundred pounds, and the tapping machine likewise weighs upwards of four hundred pounds; thus there was over eight hundred pounds weight on this sleeve during the period of tapping. This sleeve, according to the testimony, is capable of carrying ten times the weight of this valve. For eighty-two days after this first valve was completed the sleeve bore the pressure of the water on the valve — thirty-five pounds per square inch — and it was also in use for a week before the break, under service conditions. After the break the broken portion of the sleeve was under water for about a week, during which interval the face of the break became somewhat discolored, but, the witnesses say, not to such an extent as that a visual inspection would disclose a defect in the metal, if any such there was; that their examination of the sleeve showed that there was no defect in the metal. The testimony of the experts makes it *Page 528 
perfectly clear that the sleeves were of a size amply sufficient for the purpose, and, in fact, that the same sized sleeves were used to support valves where the pressure of water was four or five times as great.
From the testimony I find that the sleeves were suitable and proper for the purpose, and that it has not been proven that the workmanship or metal in the sleeve were defective.
Other theories are suggested as to the cause of the break. The complainant's witnesses say that they believe that the break was caused by the sagging of the new pipe; that the lead joints in the cross-overs were rigid and not sufficiently flexible to take up the sagging; that this put a great weight on the sleeve, which it was not intended to carry, and the sleeve broke; and the fact that the break was, as above indicated, in the upper part of the sleeve, justifies this inference. But McGovern asks why, if this sleeve broke, did not the other four sleeves, or some of them, break? The answer to this is that the lead joints at those points may have been flexible and yielded sufficiently to the sagging so as not to put pressure on the sleeves. And I think that all — certainly, most of the witnesses — agree that if this sagging happened, it was sufficient to cause the break unless the lead joints yielded.
To account for this sagging, some of the witnesses say that the foundation under the new pipe was not sufficiently firm to support the weight placed upon it when the water was turned into the pipe, and it appears that, since the break, the pipe at this point is supported by a saddle of concrete.
If the contract with the complainant had been to install both the wet and dry connections and do all the work, it would be in a different position. Here the complainant did the work in a good and workmanlike manner, from all that appears in the case, and the work stood up under conditions which, if the sleeve was defective, a break would have occurred before McGovern put in his cross-over. The burden of proof is on McGovern to show that the work of complainant was defective. This he has not sustained. After McGovern completed the repairs occasioned by the break the *Page 529 
city accepted the work and paid him $8,485 on September 13th, 1921; thus the amount due to complainant fell due and payable. A decree, therefore, will be advised in favor of the complainant.
Turning to the controversy between McGovern and the city of Jersey City, McGovern entered into a contract on the 19th of August, 1919, for the construction of a pipe line in the city of Jersey City. Annexed to the contract are instructions to bidders. Under section H all bidders for work are required, before submitting bids, to examine the site of the work and the adjacent premises, and the various means of approach to the site, and make all necessary investigation in order to inform themselves thoroughly as to the character and magnitude of all work involved in the complete execution of the contract, "and no plea of ignorance of conditions that exist, or that may hereafter exist, or of difficulties that will be encountered in the execution of the work hereunder, as a result of failure to make necessary examinations and investigations, will be accepted as sufficient excuse for any failure or omission on the part of the contractor to fulfill every detail of the requirements of this contract, or will be accepted as a basis for any claims whatsoever for extra compensation." In his proposal, McGovern states "undersigned also declares that he has examined and fully understands the attached `Instructions to Bidders,' the form of contract specifications and this form of proposal and the drawings referred to herein;" and that he "hereby proposes to furnish all the seventy-two-inch steel water pipe and appurtenances required, and all labor, machinery, tools, materials and incidentals necessary to furnish, install and complete the pipe line for Jersey City in accordance with the prices named in this proposal, at his own proper cost and expense, and in a first-class manner and in accordance with the advertisements, plans, specifications and foregoing `Instructions to Bidders,' all of which are part of the contract hereto annexed, to such an extent as they relate to or govern the obligations herein proposed to be assumed, and in accordance with such detailed directions and plans, showing approximately *Page 530 
the extent and character of the contract; also such drawings or instructions as may be furnished from time to time during the progress of the construction of the work by the engineer acting for the board of commissioners, or the board of commissioners." In the contract, McGovern, as party of the first part, "does, for himself and his executors or assigns, covenant, promise and agree to and with the said mayor and aldermen of Jersey City, New Jersey, its successors and assigns, party of the first part, that they, the party of the second part, their heirs, executors, administrators and assigns, shall and will furnish all the seventy-two-inch steel water pipe and appurtenances required, and all labor, machinery, tools, materials and incidentals necessary to furnish and complete the pipe line for Jersey City as appears in the body of this contract under the head of `Items' at their own proper cost and expense, in a first-class, workmanlike manner and according to the best of his ability, and in accordance with the general specifications and conditions herein contained and made part of this agreement, and in accordance with such detailed directions, plans, drawing and instructions as may be furnished and given by the director acting for the board of commissioners, or their engineer, during the progress of the construction of the work, which directions, plans, drawings and instructions are hereby made part of this agreement."
The items comprised in the bid and contract are thirty-seven in number, totaling, in price, upwards of $2,000,000. In section 39 it is provided that "all other work not enumerated in this schedule, but required by order of the board of commissioners, shall be considered as extra work. All extra work will be estimated by the engineer and paid for in accordance with section M of this contract. Section D provides that the board may make changes in the plans, and if the changes render work necessary which is of a class not included in the schedule of prices, the same shall be paid for as extra work." Section M provides that "the contractor shall do all extra work in connection with this contract as the board of commissioners may direct in writing. It shall *Page 531 
be done in first-class, workmanlike manner, and under the same requirements as other work contemplated in this contract; and the contractor agrees to accept as full compensation for such extra work the reasonable cost of the work as determined by the engineer, plus fifteen per cent. of such cost." Then follows an elimination from the cost of certain items of expense of the contractor.
Under the head "Responsibility of Contractor, section P," it is provided that "the contractor, party of the second part, further agrees to be responsible for the entire work embraced in this contract until its completion and final acceptance, and that any unfaithful or imperfect work, or work that may become damaged from any cause, either by act of commission or omission to properly guard and protect the work that may be discovered at any time before the completion and acceptance, shall be removed and replaced by good and satisfactory work, without charge, immediately on the requirement of the engineer, notwithstanding it may have been overlooked by the proper inspector and have been estimated upon. It is fully understood by the contractor that the inspection of the work shall not relieve him of any obligation to do sound and reliable work as herein provided; and that any omission to disapprove of any work by the engineer at or before the time of the monthly estimate, or other estimate, shall not be construed to be an acceptance of any defective work."
Under the head "Final Estimate," the contract reads as follows:
"Two months after the time of completion and acceptance of the work as specified and contracted for the board will cause its engineer to make a final estimate of all the work done, and the full amount of said final estimate will be paid, less any amounts retained to complete the work, according to the provisions of the accompanying specifications, and less damage or money paid by the city by reason of said contractor having failed to carry out completely and faithfully all the obligations and requirements herein contained. Upon final settlement according to the conditions herein specified, and not until such settlement shall have been made, will the contractor be relieved from the obligation assumed in the contract." *Page 532 
This is an entire contract providing for the doing of all work and furnishing of all materials necessary to complete the pipe line. The case, as to the main contract, comes within the rule laid down in School Trustees of Trenton v. Bennett,27 N.J. Law 513. In that case Mr. Justice Whelpley, speaking for the supreme court, said (at p. 517): "No rule of law is more firmly established by a long train of decisions than this — that where a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract." The court further said: "If a party, for a sufficient consideration, agrees to erect and complete a building upon a particular spot, and find all the materials and do all the labor, he must erect and complete it because he has agreed to do so." There, while the contractor was erecting the building in a good and workmanlike manner, the building fell by reason of some latent defect in the soil. The contractor was held liable. This case has been approved in a great number of cases, which may be found cited in Shep. N.J.Citations.
In Boyle v. Agawam Canal Co., 22 Pick. 381, the plaintiff made a contract with the defendant for excavations and embankments to be paid for at twenty cents for each cubic yard of excavation and like sum for each cubic yard of embankment. An unusual freshet occurred which increased the cost to the contractor. For this increased cost he sued the canal company as for extra work. The court said that "the contract must be considered as a contract to pay for so many cubic yards of embankment, as the same, when finished, would measure, and to pay for so many cubic yards of excavation as would be required to make the canal as stipulated, calculating upon the amount of each to be removed in the state of things as they were at the date of the contract," and held that the increased cost was not chargeable against the defendant. The court stated: "The general rule undoubtedly is that in the case of contracts for the construction of an entire work at a stipulated sum to be paid for the same, if *Page 533 
any casualty shall occur, which shall increase the labors and expenditures of the contractors, the loss must fall on him who engages to do the work."
In Horgan v. Mayor, c., of City of New York, 160 N.Y. 516;55 N.E. Rep. 204, the plaintiff made a contract with the city of New York to provide all the necessary materials and labor, and excavate, remove and dispose of all silt, sediment and other materials deposited in the bottom of the pond near Fifty-ninth street and Fifth and Sixth avenues, and to construct a concrete bottom over the same. The area of the pond was about six acres, filled with water, which water could be drained from a circular gate, twenty inches in diameter, resting upon the bottom, the water flowing therefrom into an outlet pipe and from thence into a sewer. When the water was drained down to a depth of fourteen inches the outlet pipe ceased to work; it was then discovered that the sewer was so obstructed that, unless the same was cleared out, no further water could be drawn from the pond. The engineer insisted that the plaintiff should pump the water out. The plaintiff denied that this was part of his contract, but, on the insistence of the engineer, pumped out the pond, and then sued for damages. The contract was quite similar to the one in the present case. The court said that "it would be a strange and unjust construction to require the plaintiff, under the provisions, to remove, if necessary, the entire body of the pond. This latter work is a subject on which the minds of the parties could not have met, and the plaintiff, in his estimate, did not consider that he was called upon to pump out this great body of water lying upon an area of six acres. It was proper for plaintiff to assume that the water of the lake could be discharged into the sewer through the outlet the city had constructed for that purpose." The city urged that, under subdivision 33 of the specifications, which provided that "all loss or damage arising out of the nature of the work to be done under this contract, or from any unforeseen obstructions or difficulties which may be encountered in the prosecution of the same, or from the action of the elements, or from encumbrances on the line of the work, *Page 534 
or from any act or omission on the part of the contractor, or any person or agent employed by him not authorized by this agreement, shall be sustained by said contractor," the city was not liable. The court said: "When this provision is reasonably construed, it does not operate against the plaintiff as contended. It must be held to apply to the work to be done and the unforeseen obstructions or difficulties which may be encountered under the agreement. The unforeseen obstruction that was encountered, and that subjected this plaintiff to a large amount of extra work, was entirely outside of the contract, and stands unaffected by this provision."
The above case is not in conflict with the views herein expressed, because here the thing which caused the damage was entirely within the line of the work and within the terms of the contract.
The contract in the present case does not provide against contingencies. Here McGovern agreed to furnish the materials and complete the pipe line and appurtenances on lines shown on the plans. If the cross-overs were constructed as dry connections, as originally planned, McGovern could hardly contend that he would not be liable, but, because the city changed the plans so as to put wet connections on one pipe and dry on the other, he claims that he is not responsible, because he did not guarantee the result of a change from a wet to a dry connection — that the change was made at the instance of the city, and that it should bear the full responsibility for the result. I cannot accede to this contention. There was no defect in the plans for the wet connection. Wet connections were suitable and proper for the purpose, and are in common use.
A decree will be advised that the city be allowed to deduct from the contract price of McGovern the damage which it sustained by reason of the break.
The city has presented a bill for damages for work and labor, and also for water purchased. These questions have not been argued. If the parties are content with taking the figures proven by the city, without argument, the sums so proven will be the amount deducted. *Page 535 
The parties have deemed it unnecessary to prove the amount of moneys in the hands of the city, because all agree that it is ample to satisfy the claim of the complainant after deducting any sum chargeable against McGovern.